NOT DESIGNATED FOR PUBLICATION

No. 114,012

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

The ESTATE of
LILLIAN L. LEPPKE, Deceased,
*Appellee*,

v.

MARILYN K. HEIER,
*Appellant*,

and

HAROLD E. HEIER,
*Defendant*.

MEMORANDUM OPINION

Appeal from Marion District Court; STEVEN L. HORNBAKER, judge. Opinion filed December 9, 2016. Affirmed.

*Michael P. Whalen*, of Law Offices of Michael P. Whalen, of Wichita, for appellant.

*Randall J. Pankratz*, of Adrian & Pankratz, P.A., of Newton, for appellee.

Before GREEN, P.J., MCANANY and STANDRIDGE, JJ.

*Per Curiam*:  Marilyn K. Heier appeals the trial court's judgment that she unduly influenced her parents, Lillian Leppke and Elmer Leppke to sign a joint tenancy deed which conveyed their real property to themselves and to their children. On appeal, Marilyn argues that the trial court's judgment must be reversed for three reasons: (1) The trial court failed to give her the opportunity to rebut Lillian's evidence; (2) the trial court

1

failed to support its ruling with sufficient evidence; and (3) the trial court failed to remain impartial throughout the proceedings. Finding no merit in Marilyn's arguments, we affirm.

*Background Information*

This case involves two tracts of land owned by Lillian and Elmer. The first tract of land (tract 1) consisted of 160 acres of farmland worth approximately $432,000. Elmer owned this land by himself up until December 11, 2008, when he signed a quitclaim deed (deed 1) conveying the land to Lillian and himself as joint tenants with rights of survivorship. The second tract of land (tract 2) consisted of farmland and a homestead worth approximately $190,000. Based on the information in the record on appeal, it seems both Lillian and Elmer had owned this land together for many decades.

The same day Elmer signed deed 1, December 11, 2008, Lillian and Elmer also signed and executed wills. In Lillian's will, Lillian conveyed all of her interest in the land to Elmer upon her death, but if Elmer predeceased her, her land would pass to her three children, Robert Leppke, Merle Leppke, and Marilyn, in equal 1/3 interests. Elmer's will had identical provisions, conveying all his land to Lillian upon his death or, alternatively, their three children if Lillian predeceased him.

Less than 4 months later, on April 8, 2009, Lillian and Elmer signed a single quitclaim deed (deed 2) conveying both tract 1 and tract 2 to themselves, as well as their three adult children, as joint tenants with rights of survivorship. Marilyn had driven Lillian and Elmer to a land title company and somehow procured their signatures on deed 2.

On May 30, 2009, Elmer died.

2

In the summer of 2009, Lillian decided to sell the land because she needed money. At some point, Lillian figured out that she could not sell the land without her children's permission because "she [had] signed [deed 2]." Lillian went to her estate attorney, Robert Brookens, and discussed what she could do to get the land back. Brookens suggested that Lillian attempt to get her children to sign quitclaim deeds, but if that did not work, Lillian would need to sue to regain clear title to the land.

Robert and Merle returned signed quitclaim deeds to Brookens' office. Marilyn received the quitclaim deed but refused to sign it. Because Marilyn refused to sign the quitclaim deed, Brookens did not register Robert's and Merle's quitclaim deeds. Thus, the land in question remained in a joint tenancy between Lillian, Robert, Merle, and Marilyn.

On December 14, 2010, Lillian sued Marilyn and her husband, Harold Heier, for unduly influencing Elmer and her into signing deed 2.

*Leppke I*

This is the second appeal in this case. In *Leppke v. Heier*, No. 108,377, 2013 WL 5187437, at *1-2 (Kan. App. 2013) (unpublished opinion) (*Leppke I*), this court summarized the facts of this case as follows:

> "From 2006 to 2009, Marilyn regularly served as caregiver for Lillian and Elmer. She left her own family and stayed with her parents on a regular basis for days, weeks, and months at a time. She cleaned and cooked for them, gave them medications, nursed them, and drove for them.

> "In 2008, Lillian and Elmer engaged attorney J. Robert Brookens to advise them on estate planning and real estate matters. On October 9, 2008, Brookens conferred with Lillian and advised her to retain control and ownership of her real estate during her lifetime because she might need the proceeds of any rental or sale of the real estate for

3

her own care and maintenance. In his affidavit, Brookens claims that on October 23, 2008, with Marilyn present, he again shared this same advice. Marilyn denies she heard Brookens give this advice. In December 2008, Brookens drafted for Lillian and Elmer durable power of attorney documents for health care and financial decisions. Lillian appointed Elmer and Marilyn jointly or individually as her agents, and Elmer appointed Lillian and Marilyn jointly or individually as his agents.

"On April 8, 2009, while running errands with Lillian and Elmer in downtown Marion, Kansas, Marilyn left them in the car and went inside Hannaford Title Company (Hannaford) to inquire about including herself and her siblings on the titles to her parents' real property. . . . She then had Hannaford prepare a deed naming Lillian, Elmer, and their children as joint tenants of the real property. Marilyn provided Hannaford with all the instructions on how to prepare the deed. Lillian and Elmer did not provide any directions. Marilyn and a Hannaford notary public [Marilyn Novak] brought the deed out to the car. [Novak] watched Lillian and Elmer sign the deed and she then notarized it. [Novak] stated in her affidavit that Lillian and Elmer 'signed the deed at Marilyn K. Heier's direction.'

"The next day, Marilyn filed the deed with the Marion County Register of Deeds office using a check signed by Lillian for the filing fee. That office then mailed the receipt and deed to Marilyn at her address. As we stated, the deed showed Elmer and Lillian Leppke as grantors and Elmer Leppke, Lillian Leppke, Merle Leppke, Robert Leppke, and Marilyn Heier as grantees as joint tenants with rights of survivorship. Lillian stated in her petition that Marilyn had represented to Elmer and her that the deed only transferred the property with their home on it, but the deed in fact transferred all of their real estate. In her response, Marilyn claimed she clearly represented to her parents that the deed would transfer both of their properties onto one title. She asserted the deed was only executed after the consent and verbal agreement of Lillian and Elmer.

"Marilyn's two siblings, Merle and Robert, later executed deeds reconveying the property to Lillian. Brookens sent letters on April 27, 2010, and June 2, 2010, requesting that Marilyn and Harold quitclaim the real estate to Lillian. They never did so. On December 14, 2010, Lillian filed a petition alleging the deed was void because of Marilyn's undue influence and Marilyn had breached her fiduciary duty as attorney-in-

4

fact by transacting with herself. Marilyn filed a response on January 4, 2011, in which she admitted that as attorney-in-fact for Lillian and Elmer she 'occupied a fiduciary and confidential relationship with . . . Lillian L. Leppke and her now deceased husband, Elmer H. Leppke and such relationship was in existence when . . . Marilyn K. Heier discussed adding all three children's names on each of the two real estate titles.' Although Marilyn further admitted to being present in Brookens' office on October 23, 2008, she claimed she was unaware of his legal advice to Lillian regarding the real property. She also stated that when she was attorney-in-fact for her parents, she had many discussions with them about adding the names of the children to the land deeds.

"On May 3, 2011, Lillian filed a motion for summary judgment. She noted she had told Brookens she wanted to appoint [Tammy Miller] as executor of her estate because that person 'would not try to "sneak one in [on her] like Marilyn did."' In her affidavit in response to the motion, Marilyn stated that even though Lillian maybe did not want to sign the deed, Lillian knew what she was doing when she signed and did so in accordance with Elmer's wishes.

"Upon a review of the petition, response, summary judgment motion, memoranda, affidavits, and oral arguments, the district court found there was no disputed issue of material fact as to any of the claims set forth and granted summary judgment on August 2, 2011. At the hearing and in its journal entry, the court found Marilyn admitted she had a continuing fiduciary and confidential relationship with her parents at the time the deed was recorded. Finding Marilyn was aware of Brookens' advice regarding her parents' disposition of their real estate, the court held she had breached her duty and was self-dealing for her own interest and not in the best interest of Lillian. The court found Lillian had received no benefit or consideration from the execution of the deed creating the joint tenancy. The court further found Marilyn had unduly influenced Lillian under suspicious circumstances when a confidential relationship existed between them because Marilyn instructed Lillian and Elmer who were inside a car and outside the presence of their legal counsel to execute a deed transferring all their real estate assets to Marilyn and her siblings against the previous [advice] of their legal counsel. The court granted Lillian's request to void the deed and awarded her attorneys fees pursuant to K.S.A. 2012 Supp. 58-657(g)."

5

Marilyn and Harold appealed the trial court's ruling granting summary judgment in favor of Lillian. This court reversed the trial court's summary judgment ruling and remanded to the trial court for further proceedings. *Leppke I*, 2013 WL 518774347, at *1. In reaching this holding, this court explained that to establish a presumption of undue influence, plaintiffs must prove (1) that they had a confidential relationship with the defendant and (2) that suspicious circumstances surrounded the transaction in question. *Leppke I*, 2013 WL 518774347, at *4. This court further explained that once plaintiffs establish a presumption of undue influence, the burden shifts to the defendant to disprove that the transaction was affected by undue influence. *Leppke I*, 2013 WL 518774347, at *4.

Because Marilyn and Harold's answer admitted that a confidential relationship existed, this court held that Lillian established the first prong of the presumption of undue influence test. *Leppke I*, 2013 WL 518774347, at *5. Moreover, this court held that suspicious circumstances surrounded the transaction under the second prong of the undue influence test. *Leppke I*, 2013 WL 518774347, at *5. Nevertheless, this court determined that Marilyn and Harold met their burden to preclude the summary judgment ruling for the following reasons: (1) Marilyn disputed hearing Brookens' advice at the October 23, 2008, meeting; (2) Marilyn asserted that she explained deed 2 to Lillian and Elmer; and (3) Marilyn asserted that Lillian and Elmer remained in the car because of their old age, not because she was trying to trick them into signing deed 2. *Leppke I*, 2013 WL 518774347, at *7. This court found that summary judgment was inappropriate because the preceding facts controverted Lillian's assertions of undue influence. *Leppke I*, 2013 WL 518774347, at *7. This court simply stated: "Reversed and remanded for further proceedings." *Leppke I*, 2013 WL 518774347, at *8.

At the first hearing following remand, the parties jointly agreed to dismiss the undue influence claim against Harold given that his name was not on deed 2. Marilyn's attorney also argued that she should be allowed to amend her answer to omit the part where she admitted that a confidential relationship existed. Evidently, Marilyn had filed her answer pro se. Marilyn's attorney asserted that since the *Leppke I* court reversed the trial court's summary judgment ruling, the entire case started over. Lillian's attorney countered that the *Leppke I* mandate meant that the parties had to have a trial. Yet, Lillian's attorney also argued that because the *Leppke I* court held that Lillian had established that a presumption of undue influence existed at the summary judgment stage, the trial would be limited to Marilyn presenting evidence that rebutted the established presumption. Said another way, Lillian's attorney argued that the *Leppke I* court's presumption of undue influence ruling was the law of the case, meaning the burden of proof had permanently shifted to Marilyn for the remaining proceedings.

The trial court rejected both Marilyn's and Lillian's arguments. First, the trial court rejected Marilyn's attorney's argument because it found that the *Leppke I* mandate did not require the case to start over. The mandate simply meant that it had erred in granting summary judgment because material facts were in dispute. The trial court also decided to deny Marilyn's motion to amend her answer because the case had been going on too long and any amendment would substantially prejudice Lillian. Second, the trial court rejected Lillian's attorney's argument, determining that the *Leppke I* mandate did not make the presumption of undue influence the law of the case. Thus, the trial court ruled that the trial would be on all of the evidence, not just Marilyn's evidence.

About a year later, Lillian's new attorney reargued that the *Leppke I* court's mandate required that the trial be limited to Marilyn presenting evidence rebutting Lillian's already established presumption of undue influence. Marilyn's attorney

countered by reminding the trial court that it had already rejected this argument. The trial court denied Lillian's attorney's renewed motion, reiterating that Lillian must present her entire case at trial because the burden of proof had not shifted to Marilyn yet.

*The Bench Trial*

Lillian's bench trial was held on October 9-10, 2014. At the trial, Lillian called the following witnesses: Marilyn, Novak, Brookens, and Roger Hiebert.

Testifying as an adverse witness, Marilyn explained that she had never heard either of her parents talk about wanting to sell the land. Marilyn testified that she remembered going to Brookens' office on October 23, 2008. She testified that she was driving her mother around town, running different errands, when her mother told her to pull into Brookens' parking lot. Marilyn asserted that she had never seen or spoken to Brookens before the October 23, 2008, meeting.

Marilyn explained that she was present at the meeting, but she could not remember anything Brookens told her mother because Brookens was speaking quietly. Specifically, Marilyn testified:

> "No, I really couldn't hear him. He—he talked low and legal. I wasn't really hearing what he was saying. It was a blah, blah, blah, blah, blah, blah, blah, blah. And I'm not so sure that I was getting the gist of what he was saying."

Marilyn also testified that she was not sure if the land was discussed because "[i]t was all a bunch of legal gobbledygook." Later, however, Marilyn admitted she believed she heard Brookens mention that her mother's name was on the deed for tract 2. She also asserted that her actions regarding deed 2 were consistent with Brookens' advice during the meeting.

8

Regarding April 8, 2009, the day Marilyn visited the Hannaford Title Company, Marilyn explained that she was planning on driving her father to a doctor's appointment early that afternoon but was running late. She testified that she met her parents at the doctor's office. She testified that following the appointment, she drove her parents around town running errands. Marilyn testified that she was in a pharmacy picking up medicine for her father when she noticed the Hannaford Title Company across the street. Marilyn explained that since her father's prescriptions were not ready yet, she decided to walk across the street and ask about drafting a deed naming her parents, her siblings, and herself as coowners. Marilyn testified that she never planned on going into the Hannaford Title Company that day.

Marilyn testified that while inside the Hannaford Title Company, she was helped by Novak and "a blonde lady." Marilyn testified that Novak told her it would cost $50 for each deed or she could consolidate tract 1 and tract 2 onto one deed and pay $50 total. Marilyn asserted that Novak had all the information concerning the legal description of the land. Marilyn testified that she then went back to speak with her parents, who remained in the car across the street next to the pharmacy.

During the duration of Marilyn's time in the pharmacy and the Hannaford Title Company, her parents remained in the car because although they were mentally intact, they were physically feeble. Marilyn asserted that this is why her parents never got out of the car. Marilyn alleged that during either her first or second trip back to the car, she got her parents' approval to allow the Hannaford Title Company to insert the legal description of each tract of land on one deed, naming themselves and their children as joint tenants with rights of survivorship.

Marilyn testified that upon returning to the Hannaford Title Company, presumably after the second trip to speak with her parents in the car, Novak had deed 2 drafted and ready to sign. Marilyn testified that Novak told her to bring the car from the pharmacy

9

parking lot into the Hannaford Title Company parking lot so that she could bring deed 2 to her parents. In this way, her parents could avoid getting out of the car. Marilyn testified that after driving the car into the Hannaford Title Company parking lot, Novak brought out deed 2 on a clipboard. She testified that her parent's willingly signed deed 2. Marilyn estimated that her parents had deed 2 only a minute or two because they signed it almost immediately. Marilyn alleged that she never pressured her parents to sign deed 2. Marilyn explained that she does not actually know if her parents read deed 2 before signing it because she walked away from the car once Novak came out with the clipboard. Marilyn testified that she felt like her parents wanted some space when they signed deed 2.

Yet, Marilyn also testified that she frequently spoke with her parents about making the in-life transfer in the months leading up to the signing of deed 2. Marilyn asserted that during these conversations, her parents agreed that their children's names should be on the deed as a "safeguard" to prevent other family members from preying on their parents' old age. While testifying, Marilyn implied that she was protecting her parents from Merle, who she stated was a thief. She also admitted, however, that her parents never seemed to have any concerns about Merle. Marilyn stated that based on these previous conversations, she believed her parents understood what they were doing when they signed deed 2.

Marilyn testified that after her parents signed deed 2, her mother handed her a blank check with her signature on it to pay the Hannaford Title Company. Marilyn testified that she recorded deed 2 the next day while running errands with her mother. Marilyn further testified that her mother gave her another blank check with her signature on it to pay the register of deeds. When asked why she had the registration receipt and the executed deed 2 sent to her address instead of her parents' address, Marilyn testified that she did not know why she had the receipt and deed 2 sent to her address. Marilyn admitted that she never told Merle about having his name inserted on the deed and told

10

Robert only sometime after Elmer's funeral in June 2010 that she had his name placed on the deed. Marilyn also explained that she purchased insurance for the land on her credit card but then reimbursed herself with money from her parents' bank account. Evidently, Marilyn used her powers as her parents' attorney-in-fact to write the check to herself without either of her parents' signatures.

Novak initially testified that it was Marilyn's idea to have Lillian and Elmer sign deed 2 in the car, but later she testified that it might have been her idea. She also initially testified that Marilyn had brought in the legal description of the land but later testified that maybe she looked the legal description up in the Hannaford Title Company database. Novak asserted that when Marilyn told Lillian and Elmer to sign deed 2, she stood by the car the whole time. Novak asserted that Lillian and Elmer had the deed just long enough to sign it, and nobody read deed 2 to them. Novak testified that Lillian and Elmer may have been incompetent. Novak explained that Lillian seemed confused, and Elmer could hardly move because of his mobility issues.

Brookens testified that Lillian contacted him for some estate planning work in early fall 2008. Brookens testified that on October 9, 2009, he met with Lillian and she brought up whether to put the land in a joint tenancy with her children. He testified that he told Lillian that she should not consider placing the land in a joint tenancy with her children if she and Elmer did not have enough liquid assets available to pay for their expenses the remainder of their lives. He also testified that he told Lillian there would be negative tax consequences attached to gifting the land during her life.

Brookens explained that Lillian told him that she wanted Marilyn involved in her estate planning. Brookens testified that on or about October 22, 2008, Marilyn called him and asked to be notified about any future meetings with her mother. Brookens explained that the day of Lillian's October 23, 2008, meeting with him, Marilyn showed up early

11

and attempted to ask him questions before Lillian arrived. Brookens explained that he told Marilyn he would talk to her in Lillian's presence only.

Brookens alleged that once Lillian arrived, the meeting commenced. Marilyn brought up the topic of placing the land into a joint tenancy with rights of survivorship between her parents, her siblings, and herself. Brookens alleged that he told both Marilyn and Lillian this was a bad idea because Lillian and Elmer would need to sell the land if they ran out of money. Brookens testified that Marilyn responded by stating that "makes sense now," but he could tell that she was not happy that he had recommended against placing the land in a joint tenancy. He also testified that Marilyn often spoke in the place of Lillian, telling him "her mother's wishes."

Brookens explained that he told Lillian, in front of Marilyn, that he believed the best way to handle the land would be to transfer the land to the children upon both Elmer's death and her death. Brookens explained that this is why Lillian and Elmer executed wills on December 12, 2008, conveying their land to their children in equal shares upon both of their deaths.

Brookens testified that following the October 23, 2008, meeting, neither Lillian nor Elmer mentioned conveying the land to their children during their lifetimes. Brookens specifically testified that such a conveyance was never brought up at any point during the drafting of or the execution of their December 2008 wills or deed 1. Brookens admitted that Elmer was not involved in discussing the terms of his will or deed 1 in the drafting phase. Brookens testified, however, that he went through Elmer's will and deed 1 with Elmer in detail before he signed it. Brookens testified that he wanted to make sure that Elmer understood the documents and agreed to their terms. Brookens also testified that Elmer executed the documents in his car because of his mobility issues.

Brookens explained that the next time he heard about placing the land in a joint tenancy between Lillian, Elmer, Robert, Merle, and Marilyn was in late April 2010. This was when Lillian contacted him about almost $2,000 missing from her bank account. Brookens explained that Lillian was confused why the money was missing. Brookens testified that this is when he tracked down the check Marilyn had made out to herself for insurance on the land. Then, Brookens explained that at an April 26, 2010, meeting with Lillian, Lillian told him that the land was now being held by her and her children as joint tenants with rights of survivorship. Brookens explained that when he asked Lillian about the deed, Lillian responded as follows:

> "[Lillian] remember[ed] a time going to town with [Marilyn]. She and Elmer had gone to town to go to the bank because Marilyn had some—some business to do for their bank. She—at the time, she states that she couldn't figure out why she couldn't do it herself, but Marilyn was in town, and that would be fine, and Marilyn was going to do something. They stay in the car and waited for Marilyn. Marilyn went into the bank and came back out. I said what did she do in the bank? I really don't know was her comment. And then what did she do? Did she have papers with her? No. She said, just a minute, I'll be back again. And then she came out with a woman, and she said, you need to sign this, and I did, and—so did Elmer. And the woman left, and we left the bank."

He also explained that Lillian told him that "[she] guess[ed] [she] signed that." Brookens asserted that he and Lillian spent the rest of the meeting talking about the consequences of signing the deed and whether she could get the land back.

Brookens further testified that he does not believe Marilyn ever called him to get a quote for drafting a deed. Brookens explained that his receptionist knows not to give quotes over the phone; thus, it was very unlikely that Marilyn spoke with his receptionist. He also explained that a typical fee for drafting a deed is between $30-$50.

13

Hiebert, a realtor, testified that Elmer approached him to appraise the land in 2003. In fact, Elmer and Lillian almost sold tract 1 in 2003, but the buyer backed out at the last minute. Hiebert testified that Lillian and Elmer approached him about selling the land again sometime before April 2009, but they all agreed to wait until after flood season to seriously consider selling the land. Hiebert explained that after Elmer's death, Lillian mentioned selling the land once more. Yet, Hiebert testified that Lillian later told him she could not sell the land because she no longer owned the land outright. Hiebert testified that as Lillian told him this she was weeping and saying that "she guess[ed] she signed it."

In addition to the preceding witnesses, both parties agreed to have Lillian's deposition testimony read into the record even though Lillian, now aged 96, was present at the trial.

At Lillian's deposition, which happened just 3 weeks before trial, Lillian testified to the following: (1) that Marilyn took her money; (2) that she remembered Marilyn driving their car from one parking lot into the parking lot of the Hannaford Title Company; (3) that she remembered a woman named Marilyn Novak working at the Hannaford Title Company standing with Marilyn as they signed the deed; (4) that Marilyn repeatedly told Elmer and her to hurry up and sign the deed, possibly because it was getting dark; (5) that Marilyn told Elmer and her that they better sign the deed; and (6) that Marilyn was being very pushy about signing the deed.

After Lillian's deposition was read into the record, Lillian rested. Lillian's attorney told the trial court that he believed they had established a prima facie case of undue influence because both a confidential relationship and suspicious circumstances existed. Lillian's attorney argued that as a result, a presumption of undue influence existed and the burden of proof now shifted to Marilyn to rebut the presumption. Marilyn's attorney responded by asserting that Marilyn was entitled to judgment as a matter of law because

14

Lillian had not established a presumption of undue influence. Thus, according to Marilyn's attorney, the trial court did not need to shift the burden of proof to Marilyn but direct the verdict in Marilyn's favor.

The trial court denied both Lillian's motion and Marilyn's motion. In doing so, the trial judge stated:

> "I'm going to deny both motions, so let's just hear your evidence. I mean, I've already ruled, maybe wrongfully, but I don't think I can get in trouble for that—that—the Court of Appeals, you know, didn't order me to start the case, essentially for you to defend the case now.
>
> . . . .
> "Even though I think there's some language in there that indicates I could have done that. Probably wouldn't have had any problem with it. I'm trying to be out of an abundance of caution—and we're here—let's hear the evidence, the whole case is going to come in. I'll make a decision."

Marilyn's attorney then asked the trial court whether its ruling meant that the burden did not shift onto Marilyn. The trial judge responded:

> "That's correct. I'm not going to . . . I think that I could do that . . . if I felt that there was evidence to do it, to support it. I'm just not going to get into that quagmire at this point. I don't think that the Court of Appeals was clear in what they wanted me to do. Because if they were clear in what they wanted me to do, they wouldn't have said reversed, they would have said reversed with directions to start with—[Marilyn's] defense."

In response, Marilyn's attorney stated that "[w]e agree exactly, your honor." Next, the trial judge again stated, "Let's hear what you have to say." Marilyn's attorney replied, "We will call Marilyn Heier to the stand."

15

When testifying on her own behalf, Marilyn testified that she could remember asking Brookens about the possibility of putting the land in a joint tenancy but she could not hear Brookens' response because he was talking too quietly. Marilyn testified that she spoke to her parents about executing a deed that named themselves, her siblings, and herself as joint tenants with rights of survivorship before she went to the Hannaford Title Company. Marilyn testified that her parents never resisted this idea. Marilyn explained that she called Brookens' office at some point and asked about drafting the deed, and a receptionist told her that it would cost approximately $200. Marilyn explained that when she learned about the $150 price difference upon talking to Novak, she decided that it would be best to just get everything done at the Hannaford Title Company as opposed to Brookens' office. Marilyn testified that she did not force her parents to sign the deed or rush her parents while they signed the deed.

After Marilyn's testimony, the defense rested. The trial court requested that both Lillian and Marilyn submit proposed findings of fact and conclusions of law. The trial court stated that once it had both Lillian's and Marilyn's proposed findings of fact and conclusions of law it would issue its decision.

*The Trial Court's Decision*

Lillian and Marilyn complied with the trial court's request to submit proposed findings of fact and conclusions of law. Eventually, the trial court adopted Lillian's proposed findings of fact and conclusions of law almost verbatim. The trial court determined that many facts, including Marilyn's admission, supported that a confidential relationship existed. The trial court also determined that suspicious circumstances existed because the facts supported the following: (1) that Marilyn did not act in good faith; (2) that Marilyn initiated the land transaction; (3) that Marilyn's actions and conduct were suspect; (4) that Marilyn had self-serving motives; (5) that Marilyn never sought any independent advice about the land transaction and had in fact ignored Brookens' advice

16

against the land transaction; (6) that Lillian's and Elmer's physical and mental conditions placed their competency in question; and (7) that Lillian and Elmer received no benefit for placing their land in a joint tenancy with their children.

The trial court also explained:

"Plaintiff is resubmitting its arguments to the Court regarding *Leppke* [*I*]. [The] Court of Appeals found no fault with the manner in which a confidential relationship and suspicious circumstances were shown through the summary judgment proceedings. [Citation omitted.] Indeed, this opinion only cites approximately seven facts dispositive of the suspicious circumstances, and found that this was enough to meet the burden. At trial, Plaintiff proved several times as many facts as those listed in the Court of Appeals decision that were supportive of her position on this point. Based on the Court of Appeals rationale, this Court finds that Plaintiff met her burden with respect to proving suspicious circumstances and a confidential relationship. The only reason the Court of Appeals reversed and remanded was because there were still controverted issues and the Court of Appeals believed that this Court should have taken the opportunity to weigh the credibility of the testimony and the evidence. [Citation omitted.] The court having now complied with the mandate of the court of appeals, finds that overall, the credibility issues [are] resolved in favor of the plaintiff. The defendant's credibility having been called into issue on several occasions where she made unbelievable statements and statements that directly contradicted her previous statements or writing."

Accordingly, the trial court ruled that Marilyn unduly influenced Lillian and Elmer into signing deed 2. As a result, the trial court voided this deed.

*Since Docketing the Appeal*

On November 19, 2015, Lillian died. Lillian's attorneys moved to substitute Lillian's estate as a party in her place. On February 29, 2016, this court granted the motion to substitute Lillian's estate as a party.

17

*Did the Trial Court Deny Marilyn the Opportunity to Rebut Lillian's Evidence?*

Marilyn first argues that the trial court abused its discretion because it failed to allow her to present rebuttal evidence. Marilyn argues that under Kansas law, after a plaintiff presents a prima facie case of undue influence, a presumption of undue influence exists and the burden shifts to the defendant to rebut that presumption. Marilyn believes that the trial court misconstrued this court's mandate from *Leppke I* to mean that shifting the burden of proof was optional. Marilyn argues that had the trial court shifted the burden of proof, allowing her to present evidence rebutting the presumption of undue influence, she would have established that neither Lillian nor Elmer were unduly influenced. Accordingly, Marilyn argues that she was entitled to a new trial based on this error.

On the other hand, Lillian's estate contends that the trial court did not err because both parties were allowed to present all of their evidence before the trial court made its decision.

A review of the applicable law and facts of this case establishes that both the parties and the trial court were certainly confused about the meaning of this court's mandate in *Leppke I*. Nevertheless, any error the trial court may have committed was a technical error, having no practical effect on Marilyn's ability to defend against Lillian's undue influence claim. Furthermore, because Marilyn's attorney agreed that the burden of proof did not shift onto Marilyn at the close of Lillian's case-in-chief, any error the trial court may have committed was also invited by Marilyn.

*Standard of Review*

Whether the trial court applied the correct legal standard in exercising its discretion constitutes a question of law over which this court's review is unlimited.

18

*Graham v. Herring*, 297 Kan. 847, 855, 305 P.3d 585 (2013). Additionally, "a determination regarding the trial court's compliance with [an appellate] mandate involves questions of law over which this court has unlimited review." *Leffel v. City of Mission Hills*, 47 Kan. App. 2d 8, 15-16, 270 P.3d 1 (2011).

A trial court's action constitutes an abuse of discretion if it is based on an error of law. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). The party asserting that the trial court abused its discretion always has the burden to establish that the trial court actually abused its discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

*Burden Shift in Undue Influence Cases*

"'[U]ndue influence is a species of fraud.'" *Cousatte v. Lucas*, 35 Kan. App. 2d 858, 872, 136 P.3d 484 (2006) (quoting *In re Lucas*, 307 B.R. 703, 705 [Bankr. D. Kan. 2004]). As a species of fraud, undue influence must be proven by clear and convincing evidence. *Heck v. Archer*, 23 Kan. App. 2d 57, 62, 927 P.2d 495 (1996). To establish the existence of undue influence, plaintiffs must present evidence supporting (1) that defendants have a confidential relationship with them and (2) that suspicious circumstances surrounded the transaction in question. *Heck*, 23 Kan. App. 2d at 63. If plaintiffs present evidence of both a confidential relationship and suspicious circumstances, then a presumption of undue influence exists. *Heck*, 23 Kan. App. 2d at 63. Moreover, once a presumption of undue influence exists, the burden of proof shifts to the defendants to undermine the evidence supporting the presumption. *Heck*, 23 Kan. App. 2d at 63.

*Appellate Mandates*

Trial courts must comply with an appellate court's mandate, "consider[ing] only the matters essential to implementing the mandate." *Leffel*, 47 Kan. App. 2d at 15. If an appellate court merely reverses the trial court without providing any further directions, then the trial court has discretion when implementing the mandate. *Leffel*, 47 Kan. App. 2d at 16. On remand, the trial court continues with the case as if it "'had originally made the ruling mandated by the appellate court.'" *Leffel*, 47 Kan. App. 2d at 16 (quoting *Edwards v. State*, 31 Kan. App. 2d 778, 781, 73 P.3d 772 [2003].

*Review of Relevant Facts*

To briefly review, in *Leppke I*, this court reversed the trial court's summary judgment ruling because Marilyn controverted the evidence Lillian presented supporting the suspicious circumstances factor of the undue influence claim. Specifically, this court determined that in the light most favorable to Marilyn, her assertions that she did not hear Brookens' advice against a joint tenancy and did not force her parents to sign deed 2 placed material facts in dispute. *Leppke I*, 2013 WL 518774347, at *7.

At the first hearing upon remand, Lillian's attorney argued that because the *Leppke I* court held that Lillian had presented sufficient evidence to establish a presumption of undue influence in her summary judgment motion, the existence of the presumption of undue influence was the unreviewable law of the case. According to Lillian's attorney, any trial had to begin with the burden already shifted to Marilyn to rebut the presumption. About a year later, Lillian's new attorney made the same argument about the *Leppke I* mandate.

Nevertheless, the trial court rejected the argument of Lillian's attorneys both times. The trial court ruled that based on its interpretation of the *Leppke I* mandate, Lillian

20

would have to present her entire case at the bench trial because it believed the mandate required a trial on all the facts.

At the bench trial, Lillian moved the trial court at the close of her case to rule that she had established a presumption of undue influence. This, of course, would have resulted in the burden of proof shifting to Marilyn to rebut the presumption. The trial court denied Lillian's motion, however, using the same reasoning it relied on when denying Lillian's previous motions.

Yet, at the same time, the trial court denied Marilyn's motion for judgment as a matter of law. The trial court told both Lillian and Marilyn it wanted to hear the whole case before it made a decision. At the very end of the trial court's ruling on both motions, Marilyn's attorney stated, "We agree exactly, your honor."

*Technical Error*

Based on the preceding facts, it is readily apparent that Marilyn's argument concerning the trial court's failure to allow her to rebut Lillian's evidence stems from the debate about the meaning of the *Leppke I* mandate. To begin with, although the trial court and both parties clearly had problems deciphering the meaning of the *Leppke I* mandate, the mandate was very clear and direct. This court in *Leppke I* reversed the trial court's decision to grant summary judgment in favor of Lillian because Marilyn had presented evidence controverting the suspicious circumstances factor of the undue influence claim. In fact, the *Leppke I* court stated: "Marilyn and Harold successfully came forward with evidence in the form of affidavits that established several controverted issues of material fact that could rebut the presumption of undue influence." 2013 WL 5187437, at *7. Moreover, the *Leppke I* court further stated that the court's "ruling turned the summary judgment proceeding into a 'trial by affidavits' which denied Marilyn and Harold a trial to resolve factual disputes." 2013 WL 5187437, at *7.

21

The *Leppke I* court included no additional directions. *Leppke I*, 2013 WL 518774347, at *7-8. Thus, on remand, the trial court was required to proceed as if it had denied the summary judgment motion. See *Leffel*, 47 Kan. App. 2d at 16. This meant that Lillian's summary judgment motion was unsuccessful, and the trial court had to proceed to trial, with both parties presenting evidence, as in any other case.

As explained, once the plaintiff presents evidence establishing a presumption of undue influence, the burden shifts to the defendant to rebut this presumption. Moreover, despite its statement regarding the burden of proof not shifting, it is abundantly clear that the trial court believed Lillian presented evidence establishing a presumption of undue influence. Otherwise, the trial court would not have denied Marilyn's motion for judgment as a matter of law. That is, if the trial court believed that Lillian had not established a prima facie case of undue influence, then it would have granted Marilyn's motion for judgment as a matter of law and the case would have ended.

Although the trial court technically erred by stating that the burden of proof did not shift to Marilyn at the close of Lillian's case-in-chief, this was a technical error that did not affect Marilyn's rights at trial. In essence, the denial of both Lillian's motion and Marilyn's motion led to conflicting results. On the one hand, the denial of Lillian's motion indicates that Lillian failed to present a prima facie case of undue influence. On the other hand, the denial of Marilyn's motion for judgment as a matter of law means that regardless of what it stated, the trial court believed Lillian presented a prima facie case of undue influence. Moreover, the result of the denial of Marilyn's motion for judgment as a matter of law was that the trial continued and Marilyn presented the entirety of her defense.

In the past, our Supreme Court has held that appellate courts must "disregard[] alleged technical errors which do not affirmatively appear to have affected the rights of

22

the complaining party." *Douglas v. Lombardino*, 236 Kan. 471, 487, 693 P.2d 1138 (1985). In other words, "appellate court[s] must disregard irregularities and technical errors if the ultimate determination is just." *City of Kechi v. Decker*, 230 Kan. 315, 321, 634 P.2d 1099 (1981). Here, the trial court's statement that the burden did not shift was no more than a technical error that did not affect Marilyn's rights because she was allowed to present the entirety of her defense and rebut Lillian's evidence. Although the trial court's words did not comply with the procedural rules of undue influence cases, the trial court's actions did. As a result, Marilyn's argument that she is entitled to a new trial because the trial court failed to shift the burden of proof to her following the close of Lillian's case is fatally flawed.

In her brief, Marilyn asserts that "[w]hile [she] was allowed to present her evidence, the [trial] court refu[]sed to consider her opportunity to rebut the presumption of undue influence as required by 95 years of Kansas law." Moreover, without explaining why she would have won, Marilyn asserts that she would have won at trial but for the trial court's error. Thus, it seems Marilyn differentiates between presenting evidence in her defense from rebutting the presumption of undue influence. Nevertheless outside of simply making these bald assertions, Marilyn has in no way explained how the trial court's statement or actions negatively affected the presentation of her defense.

Our Supreme Court has consistently held that a point raised incidentally in a brief and not argued therein will be deemed waived and abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Because Marilyn has failed to explain why the trial court's actions negatively affected the presentation of her defense, she has abandoned any such argument on appeal.

Moreover, it is important to point out that the trial court considered the evidence Marilyn presented in making its ultimate ruling. This is evident by the trial court's final order where it found that after having "the opportunity to weigh the credibility of the

23

testimony and the evidence[,] . . . . the credibility issues [were] resolved in favor of the plaintiff." Thus, this is not a situation where Marilyn could not present her evidence to rebut Lillian's evidence. It is simply a situation where the trial court wrongly stated that the burden of proof did not shift onto Marilyn but then took the actions that allowed Marilyn to rebut Lillian's evidence of undue influence.

Furthermore, Marilyn's arguments near the end of her brief concerning the trial court's interpretation of the *Leppke I* mandate are flawed. Marilyn argues that the trial court clearly misunderstood the *Leppke I* mandate because it stated:

> "The only reason the Court of Appeals reversed and remanded was because there were still controverted issues and the Court of Appeals believed that this Court should have taken the opportunity to weigh the credibility of the testimony and the evidence. [Citation omitted.] The court having now complied with the mandate of the court of appeals, finds that overall, the credibility issues [are] resolved in favor of the plaintiff. The defendant's credibility having been called into issued on several occasions where she made unbelievable statements and statements that directly contradicted her previous statements or writing."

Marilyn asserts that this statement implies that the trial court held a trial on only the following: (1) The issues the *Leppke I* court determined were still in controversy—that is, whether Marilyn heard Brookens' advice, whether Marilyn explained deed 2 to Lillian and Elmer, and whether Lillian and Elmer remained in the car because of old age and (2) credibility determinations. She argues that the trial court "could not use findings from an assessment of the summary judgment claim as a replacement for the presentation and analysis of the evidence at trial."

Nonetheless, the trial court never stated that it was limited to these issues. Instead, the trial court stated that the "only reason the Court of Appeals reversed and remanded was because the issues were still controverted and the Court of Appeals believed that this

24

Court should have taken the opportunity to weigh the credibility of the testimony and the evidence," which is true. See *Leppke I*, 2013 WL 518774347, at \*7-8. If the trial court actually meant that it was considering only these issues in its ruling as Marilyn argues, why would the trial court make dozens of findings regarding why it ruled that a confidential relationship and suspicious circumstances existed?

Marilyn's whole argument is based on an unappealing technicality. Although the trial court made a technical error by stating that the burden did not shift onto Marilyn at the close of Lillian's case-in-chief, this technical error had absolutely no practical effect because Marilyn presented the entirety of her case just as she would have if the trial court had properly granted Lillian's motion. In the end, the trial court considered Lillian's evidence, considered Marilyn's evidence, and determined that Marilyn's evidence did not sufficiently undermine Lillian's evidence establishing the claim of undue influence.

*Invited Error*

Finally, at the very least, Marilyn has invited any error that may have occurred at the trial court level. In her brief, Marilyn points out that the trial court stated that the burden of proof would not shift while denying Lillian's motion at the close of her case. What Marilyn fails to point out, though, is that her attorney told the trial court that its decision regarding the burden not shifting was correct.

To briefly review, when the trial court stated that it was denying Lillian's motion to shift the burden of proof onto Marilyn, Marilyn's attorney told the trial court that he "agree[d] exactly" with the trial court. In making this statement, Marilyn's attorney approved the trial court's decision not to shift the burden of proof to her even though the trial court evidently believed that Lillian had presented a prima facie case of undue influence. Accordingly, Marilyn not only failed to challenge the trial court's burden shift ruling, but she also encouraged the trial court in its incorrect ruling.

25

When a party invites error, that party cannot complain about that error on appeal. See *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1203, 308 P.3d 1238 (2013). In this case, any error that occurred was invited by Marilyn because after the trial court incorrectly stated that the burden of proof did not shift to her to rebut Lillian's evidence at the close of Lillian's case-in-chief, her attorney told the trial court that it made the correct decision. As a result, in addition to the technical error previously discussed, any error that may have occurred was invited by Marilyn.

*Was the Trial Court's Ruling Supported by Sufficient Evidence?*

Next, Marilyn argues that the trial court's findings were not supported by sufficient evidence. Marilyn takes issue with the trial court's adoption of almost all of Lillian's proposed findings of fact and conclusions of law. In her brief, Marilyn discusses why she believes that nearly every finding of fact was somehow inappropriate.

Lillian's estate emphasizes that the trial court's findings were supported by sufficient evidence. Lillian's estate emphasizes that this court should reject Marilyn's arguments because they are all founded on reweighing the evidence. Lillian's estate asserts that undue influence cases are almost always established by circumstantial evidence.

*Standard of Review*

When reviewing a trial court's decision following a bench trial for sufficiency of the evidence, this court will not disturb the trial court's decision so long as evidence supports it. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). The evidence supporting the trial court's decision may be circumstantial evidence. *Siruta v. Siruta*, 301 Kan. 757, 767, 348 P.3d 549 (2015). Additionally, the circumstantial

26

evidence supporting the trial court's decision does not need to exclude other reasonable interpretations to be sufficient. *Siruta*, 301 Kan. at 767.

In conducting this review, this court must view all evidence in the light most favorable to the prevailing party. Moreover, in conducting this review, this court cannot reweigh evidence or the trial court's credibility determinations. See *Gannon*, 298 Kan. at 1175-76.

*Evidence Required to Establish Undue Influence*

Again, to establish that a deed was signed based on undue influence, plaintiffs must provide evidence (1) that the defendant had a confidential relationship with them and (2) that suspicious circumstances surrounded the signing of the deed. *Heck*, 23 Kan. App. 2d at 63; see *In re Estate of Haneberg*, 270 Kan. 365, 375, 14 P.3d 1088 (2000). Plaintiffs must also prove that the defendant destroyed their free agency. *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 (1968). In the past, our Supreme Court has held that "[u]ndue influence does not consist of mere gratitude for kindness, affection or esteem where a conveyance is induced thereby, nor does it operate in the way of suggestions, entreaties or importunities, short of overpowering a grantor's will." *Cersovsky*, 201 Kan. at 467. Further, "'[p]ower, opportunity, and purpose to exercise undue influence, or possibility, conjecture, surmise and suspicion that undue influence has induced a [transaction], alone cannot authorize the inference that such influence has in fact been exercised.'" *In re Estate of Haneberg*, 270 Kan. at 374 (quoting *In re Estate of Millar*, 167 Kan. 455, 465, 207 P.2d 483 [1949]).

Yet, the existence of a confidential relationship implies "a condition of superiority of one party over the other." *Cersovsky*, 201 Kan. at 468. In those cases, "undue influence may be inferred because of the confidential or fiduciary relation between the parties." *Cersovsky*, 201 Kan. at 467-68. Furthermore, "what constitutes undue influence is a

27

question of fact and depends on the circumstances of each particular case." *Cersovsky*, 201 Kan. at 467.

In regards to suspicious circumstances, courts may consider a variety of factors, including evidence of the following: (1) the absence of good faith; (2) "the relation of the parties"; (3) "the time and manner of making suggestions or giving advice"; (4) "the motive, if any, in making suggestions"; (5) the absence of independent advice; (6) the grantor's competency; and (7) the absence of valuable consideration. See *Frame, Administrator v. Bauman*, 202 Kan. 461, 467-69, 449 P.2d 525 (1969) (where our Supreme Court considered the preceding factors in determining whether the trial court erred in its undue influence finding).

*Marilyn's Arguments Concerning Insufficient Evidence Fail*

On appeal, Marilyn does not challenge the trial court's factual findings supporting that a confidential relationship existed. Instead, Marilyn challenges only the trial court's factual findings regarding the existence of suspicious circumstances. Undoubtedly, this is because Marilyn admitted a confidential relationship existed in her answer to Lillian's petition. Nevertheless, an issue not briefed on appeal is deemed abandoned. See *Friedman*, 296 Kan. at 645. Accordingly, on appeal, Marilyn has abandoned any argument she might have had regarding the existence of a confidential relationship.

Turning to Marilyn's suspicious circumstances arguments, we note that Marilyn takes issue with many of the trial court's factual findings in support of its ultimate suspicious circumstances finding. Often, Marilyn has challenged either the trial court's word choice or the quality of evidence supporting that finding. Nevertheless, it is readily apparent that nearly every argument Marilyn raises regarding the sufficiency of the evidence requires this court to reweigh the evidence.

28

*The Absence of Good Faith*

The trial court found that Marilyn lacked good faith when it came to the land transaction, which supported the existence of suspicious circumstances surrounding the signing of deed 2, for the following reasons:

"(a)  The Leppkes were alone and confined in the parked car;

"(b)  The Leppkes previously expressed that they did not want to deed the land to their children—the Defendant even admitted in her affidavit that she knew that Lillian did not want to sign the deed;

"(c)  The Defendant was present at Mr. Brookens' conference table when the Leppkes had been advised against executing a joint tenancy deed by Mr. Brookens;

"(d)  The other siblings of Defendant were unaware of the transaction and were never told about it by Defendant;

"(e)  Ms. Leppke was visibly confused and disoriented during the execution of the deed;

"(f)  Defendant said she walked away from the car and turned her back;

"(g)  The Defendant later paid for insurance on the land that benefitted her at the expense of Ms. Leppke;

"(h)  The Defendant refused to deed the land back to her mother despite multiple pleas by her mother to do so;

"(i)  The deed wasn't explained to the Leppkes at the time of the transaction[;]

"(j)  The Leppkes were only handed the deed just long enough to sign it."

Marilyn counters finding (a) (that "[t]he Leppkes were alone and confined in the parked car"). She maintains that her parents were not alone or confined in the car because they had each other and they could have gotten out of the car if they wanted. Thus, Marilyn's challenge lies with the specific language the trial court used to describe her parents' situation. According to Marilyn's own testimony, while her parents were together, they were also together *alone* while she went into the pharmacy and Hannaford Title Company. Although the word "alone" could refer to a situation where a single person is by himself or herself, the word "alone" may also be used to describe a situation

29

where people are separated from other people or other things. Hence, the trial court's finding that her parents were alone was entirely proper.

Furthermore, the word "confine" refers to some sort of restriction of movement. Because Marilyn was driving, she presumably had the keys. Thus, her parents' movements were dependent upon Marilyn's movements and restricted to going wherever Marilyn decided to go. Marilyn also ignores that she testified that her parents were physically feeble and her father could not go up the steps to enter the Hannaford Title building. In summary, Marilyn's arguments concerning the trial court's finding (a) involve nothing more than a debate on semantics.

Marilyn argues finding (b) (that the Leppkes did not want to deed the land to their children) was incorrect because no evidence supported that Lillian and Elmer did not want to convey the land to their children. Marilyn points out that Brookens specifically testified that he and Lillian discussed placing the land in a joint tenancy during some of their meetings. According to Marilyn, Brookens' testimony actually supports that Lillian and Elmer wanted to convey the land to their children. Thus, Marilyn not only challenges whether sufficient evidence supported the trial court's finding, but she also asserts that the evidence required the trial court to find that her parents wanted to sign deed 2.

Marilyn's arguments very clearly mischaracterize the evidence presented to the trial court. Brookens testified that Lillian wanted to place tract 1, the piece of land which was at one point owned by Elmer in fee simple, into a joint tenancy between Elmer and herself. Brookens never testified that Lillian told him that she wanted to place the land into a joint tenancy between Elmer, her children, and herself. Instead, Brookens testified that Lillian and Elmer decided to execute their wills, which conveyed the land to their children in equal shares upon their respective deaths, based on his advice that they should not convey the land to their children until both of their deaths. This evidence strongly indicates that Lillian and Elmer did not want to convey any interest in their land during

30

their lifetimes. Moreover, this evidence in no way indicates that Lillian and Elmer wanted to convey the property to their children by signing a deed like deed 2 as Marilyn seems to argue in her brief.

Therefore, sufficient evidence supported the trial court's finding that Lillian and Elmer did not want to deed the land to their children during their lifetimes. Marilyn's reference to Lillian's desire to place the land that Elmer owned in fee simple into a joint tenancy between Elmer and herself has no bearing on this particular finding.

Last, it is important to note that finding (b) included a finding that Marilyn admitted that Lillian did not want to sign the deed. The trial court's finding was based on Marilyn's affidavit statement that she

> "believe[d] with all [her] heart that Lillian knew exactly what she was doing when she [] signed the deed—in her heart maybe she didn't want to do it, and maybe she had other plans for the land when Elmer died, but the land in the deed was Elmer's 'baby,' and she chose to keep her desires hidden."

Yet, Marilyn has chosen not to challenge this particular finding on appeal.

Marilyn argues that finding (c) (that she was present at the meeting with Brookens when Brookens advised "the Leppkes . . . against executing a joint tenancy deed) was incorrect for the following reasons: (1) Brookens never advised Elmer; (2) Brookens did not know all the pertinent facts about the benefits of placing the land in a joint tenancy; and (3) Brookens testified that his clients do not always follow his advice. Marilyn's first argument mischaracterizes the evidence. Although Brookens had more interaction with Lillian, Brookens also advised Elmer on legal issues. To review, Brookens drafted a will for Elmer, drafted deed 1 for Elmer, and advised Elmer on the legal consequences of signing the will and deed 1. Although Brookens testified that he did not specifically advise Elmer against conveying the land to his children during life, Brookens did testify

31

that he advised Elmer concerning what he believed Elmer should do with the land when explaining the will and deed 1. Interestingly, Marilyn does not take issue with the fact that Elmer was not at the October 23, 2008, meeting that she attended with Lillian. This makes the trial court's finding that she was present when Brookens advised the Leppkes technically incorrect. Nevertheless, sufficient evidence supports the trial court's finding that Brookens advised Elmer to do something other than convey any interest in the land to his children during either his or Lillian's lifetime.

Marilyn's final two arguments concerning finding (c) involve the quality of the evidence the trial court relied on. Marilyn wants this court to take into account (1) that she had some undisclosed knowledge about the land that Brookens did not have and (2) that Brookens even admitted that his clients sometimes fail to follow his advice. Yet, Marilyn's allegation and Brookens' testimony does not lessen the validity of the trial court's finding about Marilyn being present when he advised Lillian against the joint tenancy. In fact, by not attacking the validity of the trial court's finding that she was present when Brookens advised Lillian against a lifetime joint tenancy land transaction, Marilyn has implicitly conceded her presence. In short, Marilyn does not deny her presence when Brookens gave this advice. Moreover, her challenges require this court to reweigh the evidence, which this court cannot do.

Marilyn's arguments regarding finding (d) (that she never told Robert and Merle about the land transaction) are similarly flawed. Marilyn emphasizes that this finding was wrong for the following reasons: (1) Her siblings did not know that she was her parents' attorney-in-fact; (2) her siblings did not need to know about the land transaction since she was her parents' attorney-in-fact; and (3) her siblings could have been told that their names were on deed 2 by their parents. Again, Marilyn implicitly concedes that the trial court's finding is correct by failing to contest that she never told Robert and Merle about the land transaction. Marilyn's assertions about being her parents' attorney-in-fact and what her parents could or could not have told her siblings are totally unrelated to the trial

32

court's finding. At best, Marilyn's reference to these points is a weak attempt at reweighing facts.

Marilyn's argument regarding finding (e) (that Lillian was visibly confused when signing the deed) is clearly meritless. Marilyn asserts that the trial court should not have made this finding because Novak was the only person who testified that Lillian was confused. Clearly, Marilyn's argument is defeated by her admission that Novak testified that Lillian looked confused. This court must construe all evidence in the light most favorable to Lillian, reversing the trial court only if its finding is completely unfounded. Accordingly, Marilyn's admission about Novak's testimony means the trial court's finding was founded and supported by sufficient evidence.

Marilyn does not sufficiently contest the trial court's finding (f) (that she walked away from the car and turned her back from her parents as they signed deed 2). Marilyn's appellate attorney, has merely listed the finding and stated nothing in regards to it. This court will not consider points raised incidentally in a brief and not argued therein, deeming those points abandoned. See *Friedman*, 296 Kan. at 645.

Marilyn argues that the trial court's finding (g) (that she "paid for insurance on the land that benefitted her at the expense of [her parents]") was incorrect. She maintains that obtaining insurance "was a responsible act and something done in the interest of *all the heirs* and . . . [Lillian]." [Emphasis added.] Moreover, Marilyn points out that she used funds from her parents' account while she was still serving as their attorney-in-fact. Thus, it seems that Marilyn wants this court to take into account that her actions of paying for the insurance out of her parents' bank accounts was within the scope of her authority. Nevertheless, Marilyn does not deny that the insurance benefited her interest in the land.

Moreover, Marilyn has implicitly conceded that the trial court's finding is true. Marilyn's issue with the trial court's finding lies within the allegation that buying

33

insurance benefited not just her, but also her parents and her siblings as coowners of the land. In making this argument, however, she concedes she bought insurance on land she now owned an interest in, which resulted in her financial gain, with her parents' money. Whether buying insurance benefited the other land owners does not undermine the trial court's finding that she bought insurance for her benefit at the financial detriment of her parents. In sum, Marilyn has waived any argument that the trial court's finding was not supported by sufficient evidence by failing to contest the trial court's actual finding.

Marilyn argues that the trial court's finding (h) (that Marilyn refused to deed the land back to her mother) was improper because it had nothing to do with her mother's undue influence claim. Marilyn's interpretation, however, is short sighted. The trial court made this finding in support of its conclusion that Marilyn acted in bad faith. Throughout the pendency of this case, Marilyn has repeatedly asserted that she wanted to do what was best for her parents and was only following her parents' wishes regarding the land. Taken in the light most favorable to Lillian, Marilyn's refusal to convey the land back to her mother upon her mother's request indicates that her mother's wishes were not Marilyn's sole concern. Thus, the trial court's finding was very clearly related to Lillian's undue influence claim. In turn, the trial court did not err in its consideration of this evidence.

Marilyn argues that the trial court's finding (i) that the deed was not explained to the Leppkes "at the time of the transaction") was incorrect because she testified that she explained deed 2 to them *before they signed it*. As a result, Marilyn contends that the trial court's finding was "patently refuted" by her "uncontroverted testimony." Nevertheless, Marilyn implicitly concedes that the trial court's finding was correct by failing to contest that nobody explained the deed to her parents *when they actually signed deed 2*. Her argument that she talked about placing the land in a joint tenancy with her parents in the car two times before she brought deed 2 to them to sign does nothing to undermine the uncontroverted fact that nobody explained or read deed 2 to them when they were physically in control of it. Furthermore, the trial court was under no duty to accept any of

Marilyn's testimony concerning her alleged conversations with her parents about conveying the land just because nobody specifically testified that this did not happen.

Marilyn does not contest the trial court's finding (j) (that Lillian and Elmer had the deed in their possession just long enough to sign the deed).

*The Relation of the Parties*

The trial court found that this was a situation where Marilyn, not her parents, initiated the land transaction, which indicated that suspicious circumstances surrounded the signing of deed 2, for the following reasons:

"(a)  The Defendant testified that she first initiated discussions with her parents concerning the topic of executing a joint tenancy deed;

"(b)  The Defendant indicated that she raised this topic with her parents multiple times in the months leading up to the harmful transaction;

"(c)  The Defendant further testified that she wanted her parents to execute the deed and that she believed that it was the appropriate thing to do;

"(d)  At the time the deed was executed, the Defendant supplied the names for the deed;

"(e)  The Defendant also likely gave the legal descriptions;

"(f)  She undoubtedly gave all instructions regarding the drafting of the deed;

"(g)  She wrote the checks to Hannaford Title and the Register of Deeds Office;

"(h)  She had the deed mailed to her own house and never gave the executed version to her parents."

Regarding finding (a) (that Marilyn initiated the joint tenancy discussion with her parents) Marilyn contends that "may have been [her] testimony." But she points out that joint tenancies "[were] not a new idea to Lillian" because she had previously asked Brookens about placing the land Elmer owned in fee simple into a joint tenancy. By acknowledging that she initiated the discussions concerning the land transaction, however, she has admitted sufficient evidence supported the trial court's finding.

35

Regarding finding (b) (that Marilyn raised the topic with her parents multiple times "leading up to the harmful transaction"), Marilyn takes issue with this finding in two ways. First, Marilyn argues that although she initiated the conversations, her parents never "objected to the idea of a joint tenancy" and "[t]hey understood why it was a good idea because it was a safeguard that the land would not be unnecessarily disturbed." Thus, Marilyn admits that evidence supported the trial court's finding by admitting that she initiated the transaction. Marilyn simply wants this court to reweigh evidence by considering other facts she believes helps her case.

Marilyn's second problem with finding (b) is that she believes the transaction was not harmful. Specifically, Marilyn asserts that "[t]here was never any harm shown to her mother by the lack of access to the sale of land." Marilyn alleges that she "took no greater share of the land than she would otherwise have received." Nevertheless, this conclusion is absurd.

To begin with, plaintiffs establish undue influence by presenting evidence (1) that the defendant has a confidential relationship with them and (2) that the transaction in question was surrounded by suspicious circumstances. *Heck v. Archer*, 23 Kan. App. 2d 57, 63, 927 P.2d 495 (1996). Plaintiffs do not need to present evidence of harm to successfully establish that they were unduly influenced. Consequently, any failure to show that the transaction resulted in harm does not require reversal of the trial court's undue influence ruling.

Returning to the trial court's actual finding, we note that ample evidence existed that the transaction harmed Lillian. Following Elmer's death, the transaction resulted in Lillian having a 1/4 interest in the land as opposed to owning the land in fee simple. This, of course, reduced Lillian's net worth and limited Lillian's ability to sell the land. Assuming Lillian had not amended her will, Marilyn would have received a 1/3 interest in the land upon her mother's death, not an immediate interest in the land with the

36

potential to own the land in fee simple upon the death of Lillian and her siblings. Again, because the transaction occurred and Lillian was upset with Marilyn, Lillian, in her will, reduced Marilyn's inheritance to 1/6 interest in the land. Moreover, according to Brookens' testimony and Hiebert's testimony, Lillian suffered emotional harm as she was distraught over her inability to sell the land and Marilyn's actions. Thus, sufficient evidence supported the trial court's finding that the transaction was harmful to Lillian.

Marilyn does not disagree with the trial court's finding (c) (that she wanted her parents to execute the deed). Instead, she urges this court to consider that she took the actions she did because "[s]he was a caring and loving daughter." Nevertheless, whatever reasoning Marilyn may have had does not matter as this court cannot reweigh evidence when the trial court's finding is supported by sufficient evidence. Moreover, there can be no question that sufficient evidence supported the trial court's finding given that Marilyn has admitted that she wanted her parents to execute deed 2.

Marilyn does not take issue with the trial court's finding (d) (that she gave Novak the names to insert in deed 2).

Marilyn argues that the trial court's finding (e) (that Marilyn "likely gave [Hannaford Title Company] the legal description" of the land) was inappropriate because (1) Marilyn testified that Novak found the legal description in the Hannaford Title Company database and (2) Novak ultimately testified that she was unsure where the legal description came from. In a similar vein, Marilyn asserts that the trial court's finding (f) (that Marilyn "undoubtedly gave all instructions regarding the drafting of the deed") was inappropriate because the finding involved speculation. Marilyn is correct about finding (e). Given that Novak testified that she could not remember if Marilyn brought in the legal description of the land or if she looked it up in the Hannaford Title Company database, there was insufficient evidence for the trial court to make this finding that

37

Marilyn "likely gave the legal description" of the land. Yet, her argument regarding finding (f) is not persuasive.

A factfinder may make reasonable inferences based on the evidence presented. *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 802, 897 P.2d 123 (1995). Here, it is undisputed that Marilyn raised the issue of placing the land in a joint tenancy between her parents, her siblings, and herself six to eight times before going to the Hannaford Title Company to accomplish this transfer. It is also undisputed that Marilyn, not her parents, went to the Hannaford Title Company to discuss the drafting of deed 2. Moreover, Marilyn has not challenged the trial court's finding (e) (that she provided Novak with the names to insert in deed 2). Under these facts, it was entirely reasonable for the trial court to infer that Marilyn provided the Hannaford Title Company with all instructions on drafting the deed.

Regarding the trial court's finding (g) (that Marilyn wrote checks to Hannaford and the Register of Deeds) and finding (h) (that Marilyn mailed the deed to herself, never giving the executed deed to her parents), Marilyn admits these facts but argues that these facts weigh in her favor. Thus, Marilyn's dispute is not with the trial court's finding, but how the trial court interpreted the finding. All the same, as with her previous arguments, by admitting the trial court's fact findings were correct, she has implicitly conceded that the trial court's fact findings were supported by sufficient evidence. Her request to interpret the facts in her favor, clearly goes against this court's rules about reweighing the evidence and interpreting evidence in the light most favorable to the prevailing party.

*The Time and Manner of Making Suggestions or Giving Advice*

The trial court made the following findings regarding the time and manner of suggestions and advice:

"(a)  The Defendant attempted to convince her parents of the merits of a joint tenancy deed despite learning of Mr. Brookens' advice;

"(b)  She represented that the deed would simply put two legal descriptions on one deed;

"(c)  The Defendant sprung the actual execution of the deed on her parents;

"(d)  She was pushy with them at the time of the transaction;

"(e)  The Defendant told the Leppkes to sign the deed and directed them to do so;

"(f)  The Defendant told the Leppkes to hurry up and sign the deed; [and]

"(g)  The Defendant told her parents that it would be 'better' if they signed the deed."

The trial court found that these facts helped establish that suspicious circumstances surrounded the signing of deed 2.

Marilyn argues that the trial court's finding (a) (that she attempted to convince her parents of the benefits of a joint tenancy deed despite Brookens' advice) is not supported by the evidence. Marilyn maintains that no evidence existed that her father was aware of Brookens' advice or that her mother ever accepted Brookens' advice. As a result, Marilyn does not take issue with the trial court's finding that she attempted to convince her parents of the benefits of a joint tenancy. Instead, her issue lies specifically with whether Brookens advised her parents against conveying the land to themselves and their children as joint tenants with rights of survivorship. As explained with one of Marilyn's earlier arguments, however, Brookens did advise Elmer about what he believed Lillian and Elmer should do with the land before Elmer executed his will and deed 1. Moreover, the fact that both Lillian and Elmer executed their wills transferring the land to their children upon their respective deaths supports that they both accepted Brookens' advice. Consequently, sufficient evidence supported the trial court's findings regarding acceptance of Brookens' advice.

Marilyn challenges the trial court's finding (b) (that she told her parents "the deed would simply put two legal descriptions on one deed") because she had explained to her parents that they would save money by placing the land onto one deed. Marilyn also

39

argues that her parents knew what they were signing; thus, her actions were not fraudulent. Yet again, Marilyn's challenge does not involve the trial court's actual finding that she told her parents deed 2 would simply place both tract 1 and tract 2 on the same deed. Instead, she wants this court to recognize that she told her parents this because it would save them money. By not challenging that she told her parents that they were merely placing tract 1 and tract 2 on the same deed, she has implicitly conceded that the trial court's finding was correct. Marilyn's request that this court consider her alleged reasoning behind her statement involves reweighing the evidence.

Marilyn argues that the trial court's finding (c) (that she "sprung the actual execution of the deed on her parents") is incorrect. She contends that she had previously discussed with her parents about placing the land in a joint tenancy between six to eight times. Thus, it seems that Marilyn takes issue with the word "sprung." As used by the trial court, the word "sprung" meant surprised. According to Marilyn's own testimony, she went to the Hannaford Title Company that day on a whim; it was totally unplanned. If the trip to the Hannaford Title Company was unplanned, then her parents would have undoubtedly been surprised about executing any deed that day regardless of any previous conversations with Marilyn. Accordingly, the trial court's finding that Marilyn "sprung" the deed execution on her parents was supported by sufficient evidence.

Marilyn argues that the trial court's finding (d) (that "she was pushy with [her parents] at the time of the transaction") was unfounded because Lillian's deposition testimony "must be considered with a grain of salt" given her incoherent moments. Marilyn also emphasizes that she testified that she was not pushy with her parents. Therefore, Marilyn takes issue with the quality of the evidence the trial court relied on.

Lillian's testimony that Marilyn was pushy was sufficient evidence supporting that Marilyn was pushy. The trial court's decision to find Lillian's testimony more reliable

than Marilyn's testimony involves a credibility determination that this court cannot review.

Marilyn argues that the trial court's finding (e) (that she told her parents "to sign the deed and directed them to do so") was incorrect because of Novak's trial testimony. As Marilyn notes in her brief, at trial, Novak testified that although she was not sure "if you would call it directing," Marilyn told her parents where to sign the deed. Again, Marilyn's argument concerns semantics. Novak testified that Marilyn told her parents to sign the deed and where to sign. This could be interpreted as directing despite Novak's reservations and Marilyn's argument to the contrary. Also, upon Lillian's attorney's request, the trial court took judicial notice of Novak's affidavit without objection. In Novak's affidavit, Novak stated that Lillian and Elmer signed the deed at "Marilyn K. Heier's direction." Thus, sufficient evidence supported this particular finding.

Marilyn argues that the trial court's finding (f) (that she "told the Leppkes to hurry up and sign the deed") was "just plain wrong" because Novak never testified that she hurried her parents in signing deed 2. In making this argument, Marilyn ignores her mother's deposition testimony where her mother testified that Marilyn hurried Elmer and her to sign deed 2. Because Lillian testified that Marilyn hurried Elmer and her to sign the deed, sufficient evidence supported the trial court's finding.

Marilyn argues that the trial court's finding (g) (that she told her parents it would be "better" if they signed deed 2) was inappropriate. Marilyn contends that because she was concerned about Merle or her eldest daughter, Tammy, "going after the family assets." Marilyn's reasons for believing that it would be better if her parents signed deed 2, however, are irrelevant. What is relevant is that Marilyn has implicitly conceded that she told her parents it would be better if they signed deed 2. Thus, she has not challenged the trial court's actual finding. As a result, sufficient evidence supported the trial court's finding.

*The Motive, If Any, In Making Suggestions*

The trial court found that Marilyn had self-serving motives in getting her parents to sign deed 2, which indicated that suspicious circumstances surrounded the signing of deed 2, for the following reasons:

"(a)  The Defendant explained that it was her idea to have the deed executed because she believed it was the appropriate thing for her parents to do;
"(b)  The motive for not telling her parents in advance about the actual signing was probably to surprise or ambush them; [and]
"(c)  Obviously the Defendant was motivated by the financial benefit she would derive from the transfer—as evidenced by her later refusal to deed the property back."

Marilyn's challenge regarding the trial court's finding (a) (that she "explained that it was her idea to have the deed executed because she believed it was the appropriate thing for her parents to do") does not concern the actual factual finding but the trial court's conclusion that this was evidence that she had self-serving motives. Again, Marilyn emphasizes that while it was her idea to execute deed 2, she was trying to protect her parents from Merle and Tammy. She contends that she had every right to help her parents in executing deed 2 because she was her parents' attorney-in-fact. Regardless, Marilyn has admitted that it was her idea to execute deed 2 because she believed it was in her parents' best interests. Whether Marilyn's reason for wanting her parents to sign deed 2 was to protect their interests in the land or to protect her potential future interest in the land involves a credibility determination, which fell within the discretion of the trial court. By admitting that it was her idea, Marilyn has waived any potential sufficiency of evidence problem with the trial court's finding.

Marilyn argues that the trial court's finding (b) (that she "probably" did not tell her parents about going to the Hannaford Title Company in advance so she could ambush them) was incorrect. She maintains (1) that "there is no such thing as probably clear and

42

convincing evidence" and (2) that she had "spoke[n] to her parents twice about what was going on prior to the presentation of the deed." The word "probably" means "very likely; almost certainly." Merriam Webster's Dictionary (online ed. 2016). Clear and convincing evidence is "[e]vidence indicating that the thing to be proved is *highly probable or reasonably certain*." (Emphasis added.) Black's Law Dictionary 674 (10th ed. 2014). Thus, a trial court's finding that evidence is probably true, that is, very likely and almost certainly true, was sufficient to meet the clear and convincing evidence burden of proof.

In regards to Marilyn's second complaint about finding (b), she asserts that she could not have ambushed her parents because after discussing the deed with the Hannaford Title Company employee, she went back to the car to check on her parents two times before bringing them deed 2 to sign on the third trip. Thus, it seems that Marilyn argues that her actions could not have been interpreted as "ambushing" her parents because she allegedly spoke to her parents a couple of times before requesting their signatures. Even with these two alleged conversations, the trial court could reasonably infer that the surprise visit to the Hannaford Title Company resulted in an ambush. As already discussed, there was sufficient evidence supporting that she "sprung" the execution of deed 2 on her parents, thus describing the situation as an "ambush" was not too much of a stretch.

Marilyn argues that the trial court could not have made finding (c) (that she was motivated by the financial benefit she would derive from the transfer") because she received no greater benefit from the transfer than she would have from her parents' respective wills upon their deaths. As previously discussed, however, this assertion is patently incorrect. Accordingly, the trial court's finding that Marilyn benefited financially from the transaction, which evidenced self-serving motives, was both appropriate and supported by the evidence.

43

*The Absence of Independent Advice*

The trial court found that the following facts supported that Marilyn failed to provide her parents with additional independent advice before bringing deed 2 to her parents to sign:

> "(a)  Mr. Brookens was not informed of the transaction by Defendant or consulted with at the time the deed was executed;
>
> "(b)  Indeed, the execution of the deed was contrary to Mr. Brookens' advice; [and]
>
> "(c)  No independent advice was given at all at the time of the event in question."

The trial court found that Marilyn's failure to provide her parents with independent advice helped establish that there were suspicious circumstances surrounding the signing of deed 2.

Each of Marilyn's arguments regarding why the trial court's findings (a)-(c) are incorrect concern how the trial court interpreted the facts. In other words, Marilyn argues that her failure to provide her parents with independent advice before bringing deed 2 to her parents to sign was not in any way suspicious. Marilyn emphasizes that her parents had not spoken to Brookens since they executed the wills in December 2008, that Brookens testified that his clients do not always follow his advice, and that she and her mother understood joint tenancies so they did not need any independent advice.

Still, by admitting that no independent advice was provided, Marilyn also admits that sufficient evidence supported the trial court's findings. Thus, Marilyn has waived any argument regarding whether sufficient evidence supported the trial court's actual findings. Moreover, the supplemental facts Marilyn relies on in arguing that her actions were not suspicious involve reweighing evidence, which this court cannot do.

*The Grantor's Competency*

The trial court found that there were major issues concerning both Lillian's and Elmer's competency to sign deed 2 for the following reasons:

"(a)  Elmer Leppke was highly medicated;

"(b)  Elmer had problems with his eyesight;

"(c)  Elmer was in a feeble and sickly state;

"(d)  Lillian Leppke previously had a stroke and portions of her face and brain were impacted;

"(e)  Lillian appeared confused and disoriented at the time that she signed the deed; [and]

"(f)  Lillian was 87 and Elmer was 91 years old when the deed was signed."

The trial court found that these competency issues undermined the likelihood that Lillian and Elmer understood what was going on when they signed deed 2.

Again, regarding findings (a)-(d) and (f), Marilyn's problem is not the validity of the individual finding, but how the trial court interpreted those findings in questioning Lillian's and Elmer's competency to understand and execute deed 2. Marilyn argues that the fact Elmer was highly medicated, Elmer had problems with his eyesight, Elmer was feeble and sick, Lillian had suffered a stroke several years earlier, and both Lillian and Elmer were elderly does not mean that they did not understand what they were doing when they signed deed 2. Thus, Marilyn admits that these findings were technically valid but challenges the trial court's ultimate conclusion that her parents' were incompetent to sign deed 2.

Yet, in the light most favorable to Lillian's estate, it is readily apparent that a 91-year-old highly medicated man, who had vision problems and was a mere month away from his death, might not have understood a document that was unexpectedly given to him to sign.  It is also readily apparent that an 87-year-old woman, who had suffered a

45

stroke and was visibly confused during a transaction, might not have understood a document that was unexpectedly given to her to sign. Moreover, according to Marilyn's own testimony, nobody read deed 2 to her parents and her parents had the deed in their possession no more than "a minute or two." Novak testified that Lillian and Elmer had possession of deed 2 "just long enough to sign their names." Because the trial court's interpretation of these facts was wholly reasonable given the evidence presented, this court cannot reweigh these facts in Marilyn's favor.

We further note that Marilyn's attorney has misrepresented the facts concerning whether Elmer's competency was in dispute. Marilyn's attorney unfairly asserts that both parties and the trial court agreed "on the record that there was no competency issue" as to Elmer. This is simply false. The parties agreed that there was no competency issue as to Elmer signing his will and deed 1 in December 2008. Lillian's attorney stipulated to the fact that Elmer was competent at this time because Brookens had testified that he had gone over Elmer's will and deed 1 with Elmer at length. Lillian's attorney's stipulation was limited to Elmer's competency to sign his will and deed 1 and not to the signing of deed 2. Consequently, Marilyn's attorney has completely misrepresented the facts to this court.

Regarding finding (e)—that Lillian appeared confused and *disoriented* when she signed the deed, Marilyn asserts that the trial court's finding regarding disorientation was inappropriate. She maintains that Novak testified that Lillian only "appeared to be confused." The word "disoriented" can be used as a synonym for the word "confused." Regardless, Marilyn admits that Novak testified that Lillian was confused. Thus, at the very least, there is no debate that sufficient evidence supported the trial court's finding that Lillian appeared confused when she signed deed 2.

*The Absence of Valuable Consideration*

Finally, the trial court found that "there was no benefit obtained by the Leppkes" for the land transaction, which indicated that suspicious circumstances surrounded the signing of deed 2, for the following reasons: "(a) There was no consideration as the Leppkes did not benefit at all; (b) Rather, the transfer was to the financial detriment of the Leppkes; [and] (c) The Defendant, however, stood to financially benefit from the transaction."

Marilyn's arguments concerning the trial court's finding (a) (that her parents received no consideration for the land transaction) center on the following belief: that placing the land in a joint tenancy with the children's name on it protected Lillian and Elmer from having the land taken from them "by one of the less scrupulous relatives." Yet, her argument does nothing to undermine the validity of the trial court's finding that Lillian and Elmer received no consideration for giving away 3/5 of their interest in the land. By failing to challenge the trial court's actual finding, she had implicitly conceded that her parents received no consideration for the land transfer. Why Marilyn believes that the transfer benefited her parents in other ways is irrelevant.

Marilyn challenges finding (b) (that the land transfer negatively affected the Leppkes financially). She contends that there was insufficient evidence to make this finding because nobody presented evidence at trial showing financial distress. Again, Marilyn has ignored the multitude of evidence showing that the transaction hurt the Leppkes, especially Lillian after Elmer's death. To repeat, both Brookens and Hiebert testified that the transaction prevented Lillian from selling the land when she needed money. Moreover, Marilyn seems unwilling to acknowledge that a person who owns 1/4 an interest in land, as Lillian did under deed 2 following Elmer's death, does not own as much as a person who owns that same land in fee simple, which Lillian would have following Elmer's death but for deed 2. Thus, the trial court's finding that the land

47

transaction negatively affected the Leppkes financially was supported by sufficient evidence.

Marilyn argues that the trial court's finding (c) (that she stood to financially benefit from the land transaction) was not supported by sufficient evidence. She contends that she "did not receive anything more than she would have had the wills been executed through probate." As explained earlier, this is totally incorrect. Therefore, sufficient evidence supported the trial court's finding that Marilyn benefited from the land transaction.

*Sufficient Evidence Supported the Trial Court's Findings*

Despite Marilyn's numerous arguments concerning the sufficiency of the evidence, the only finding that Marilyn has undermined is the trial court's finding that she "likely gave [the Hannaford Title Company] the legal description" of the land. The trial court's remaining findings remain intact.

To review, plaintiffs establish undue influence by proving that a confidential relationship between them and the defendant existed and that suspicious circumstances surrounded the transaction. *Heck v. Archer*, 23 Kan. App. 2d 57, 63, 927 P.2d 495 (1996). Moreover, there must be evidence that the defendant overpowered the plaintiff's free will. *Cersovsky v. Cersovsky*, 201 Kan. 463, 467, 441 P.2d 829 (1968).

Here, Marilyn admitted the confidential relationship. In doing so, she has conceded that she was in a position of superiority over Lillian and Elmer. See *Cersovsky*, 201 Kan. at 468 (holding that the existence of a confidential relationship implies "a condition of superiority of one party over the other, and the superior party . . . has the burden of showing the conveyance was made in good faith and for a valuable consideration"). Thus, the only question at issue is whether enough suspicious

48

circumstances surrounded the transaction to support the trial court's ruling that Marilyn unduly influenced Lillian and Elmer into signing deed 2.

Highly summarized, the following evidence supported that the circumstances surrounding the land transaction were suspicious: (1) Marilyn was present at the October 2008 meeting with Lillian when Brookens explained that transferring the land during the Leppkes' life was a bad idea; (2) Lillian and Elmer followed Brookens' advice to transfer the land upon their deaths, not during their lifetime, when they executed their respective wills in December 2008; (3) Marilyn continued to pressure Lillian and Elmer to transfer the land immediately despite Brookens' advice; (4) Lillian and Elmer never contacted Brookens or made any efforts to make the in-life land transaction despite Marilyn's pressure; (5) Marilyn did not initially tell Lillian and Elmer she was investigating the land transfer at the Hannaford Title Company; (6) Marilyn told Lillian and Elmer that the deed merely transferred the two tracts of land onto one deed; (7) Lillian and Elmer had deed 2 in their possession just long enough to sign it; (8) Lillian and Elmer did not read deed 2, and nobody read the deed to the Leppkes; (9) Elmer was highly medicated, vision impaired, and incredibly feeble when he signed deed 2; (10) Lillian, a stroke survivor, was visibly confused when she signed deed 2; (11) Marilyn admitted that she knew that Lillian did not really want to sign deed 2; (12) Marilyn was driving, meaning Lillian and Elmer were dependent upon Marilyn if they wanted to go home; (13) Marilyn paid the Hannaford Title Company and the register of deeds with Lillian's signed but blank checks; (14) Marilyn had the registration receipt and final executed deed 2 sent to her house; (15) Lillian and Elmer never had possession of the final executed deed 2; (16) Marilyn did not tell her siblings about deed 2; and (17) Lillian and Elmer were hurt financially by the transaction while Marilyn benefited financially from the transaction.

Additionally, as Lillian's estate points out in its brief, our Supreme Court has found undue influence in similar cases. In *Hoff v. Hoff*, 106 Kan. 542, 550-53, 189 P. 613 (1920), for instance, our Supreme Court held that a will was procured by undue influence

49

when a multitude of evidence supported (1) that the testator's adult child took measures to ensure the testator executed a will bequeathing most of his estate to that adult-child, and (2) the testator showed signs of incompetency.

In *In re Estate of Brown,* 230 Kan. 726, 732, 640 P.2d 1250 (1982), our Supreme Court upheld the trial court's ruling that a niece had unduly influenced her uncle to sign a will under a very similar set of suspicious circumstances. In upholding, the trial court, our Supreme Court explained:

> "We hold the evidence is sufficient to support the trial court's finding of undue influence on the part of Wilma Kugler Wolf. First, there existed a confidential relationship between Guy and Wilma. She was close to him in every way. She took care of Guy, helped him to obtain medical, legal and financial assistance, supervised his move to a nursing home closer to where she lived, and advised him on various personal and business matters. Second, suspicious circumstances are manifest. Wilma wrote an anonymous letter to Guy which was *critical of another heir* at law and then lied about it under oath. She attempted to keep others from seeing Guy and even had the county attorney prepare a notice to that effect. Finally, the events surrounding the actual execution of the will provide extra support for the trial court's finding. Wilma *set up the meeting* with the attorney; she *assisted in the preparation* of the will by paraphrasing questions to Guy and providing real estate descriptions and then remained in the room while the will was discussed; she *paid for the will* herself; she *obtained a gift for herself* of personal property by having the assignment prepared." (Emphasis added.) *In re Estate of Brown*, 230 Kan. at 732.

Moreover, our Supreme Court upheld the trial court's undue influence ruling even though it determined the trial court erred in finding that the uncle lacked testamentary capacity. 230 Kan. at 731-32.

In this case, strong evidence supported that Lillian and Elmer were incompetent, or, at the very least, Lillian and Elmer did not understand what they were doing when

they signed deed 2. Accordingly, more evidence supports the trial court's undue influence ruling in this case than in *In re Estate of Brown*. As a result, given our Supreme Court precedent in *Hoff* and *In re Estate of Brown*, the trial court's suspicious circumstances finding and undue influence ruling was appropriate.

*Conclusion*

To conclude, Marilyn has admitted that she had a confidential relationship with Lillian and Elmer. Moreover, the trial court's finding that suspicious circumstances surrounded the land transaction was supported by sufficient evidence. Accordingly, because the confidential relationship was admitted and the suspicious circumstances finding was supported by sufficient evidence, the trial court correctly ruled Marilyn unduly influenced Lillian and Elmer into signing deed 2. As a result, Marilyn's arguments fail.

*Was the Trial Judge Unfairly Biased Against Marilyn?*

Finally, Marilyn alleges that the trial judge was unfairly biased against her throughout the case. Marilyn asserts that the trial judge was unfairly biased against her for the following reasons: (1) because the trial judge asked Novak questions at trial; (2) because the trial judge adopted nearly all of Lillian's proposed findings of fact and conclusions of law verbatim; and (3) because the trial judge allegedly let emotions affect his decision. Marilyn also asserts that the trial judge was unfairly biased against her for taking the following actions *before* her first appeal to this court: (1) when the trial judge denied her motion to dismiss for lack of jurisdiction as moot; (2) when the trial judge made comments about (a) the substantive value of Marilyn's children's affidavits, which were attached to Marilyn's response to the summary judgment motion, and (b) the percentage of land Marilyn would have received had she waited to inherit the land; and (3) when the trial judge granted Lillian's motion to dismiss her first appeal as abandoned.

Lillian's estate responds that "[n]one of these actions by the trial court are, in the least sense, unusual or fanciful conduct for the trial court to engage in." Lillian's estate, however, makes no further argument regarding this issue.

When a party raises allegations of judicial bias, this court has unlimited review. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). Our Supreme Court has held:

> "The standard to be applied to a charge of lack of impartiality is whether the charge is grounded in facts that would create reasonable doubt concerning the court's impartiality, not in the mind of the court itself, or even necessarily in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances." *Smith v. Printup*, 262 Kan. 587, Syl. ¶ 8, 938 P.2d 1261 (1997).

The fact a trial judge ruled against the party "'presents a legally insufficient basis for a finding of bias or prejudice on the part of the trial judge.'" *Hajda v. University of Kansas Hosp. Auth.*, 51 Kan. App. 2d 761, 777, 356 P.3d 1 (2015), *rev. denied* 303 Kan. 1077 (2016) (quoting *State v. Hurd*, 298 Kan. 555, 570, 316 P.3d 696 [2013]). "Personal bias does not include views held by a judge based on matters that arise during litigation or views on legal issues." *In re Tax Appeal of Lyerla Living Trust*, 50 Kan. App. 2d 1012, 1024, 336 P.3d 882 (2014). A trial judge's comments will not result in reversal if there is anyway the trial judge's comments can be found unobjectionable. *Kemble*, 291 Kan. at 113. Furthermore, the "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). Actual prejudice, effecting a party's substantial rights, must occur to obtain a reversal. *Kemble*, 291 Kan. at 113.

As explained below, none of Marilyn's arguments regarding the trial judge's bias are persuasive. Moreover, at the very least, she has failed to establish any prejudice.

First, at trial, the trial judge asked Novak about where the legal descriptions of the land came from. Specifically, the following exchange occurred:

"THE COURT: I imagine [Marilyn's attorney] will probably ask you this, but I'm going to ask you since I want to know. Where did you get the legal descriptions?

"[NOVAK]: They brought them in on old deeds.

"THE COURT: Who did?

"[NOVAK]: Marilyn Heier."

Later, the trial judge raised the same issue again, stating: "[N]ow I'm bugged about it. Because [Marilyn] testified that you must have gotten the legal descriptions from the courthouse—through some computer channel from the courthouse, and that's what she testified to. . . . Is that possible?" Novak responded that this was possible and that she could not state for certain if Marilyn brought in the legal description of the land or if she looked it up in a computer database.

Our Supreme Court has held that "'[a] trial judge has the power within proper limits . . . to control [witnesses'] examination[s]. It is within his [or her] authority to propound questions to, and examine, witnesses for the purpose of eliciting facts material to the case at bar.'" *State v. Anderson*, 243 Kan. 677, 678, 763 P.2d 597 (1988) (quoting 75 Am. Jur. 2d, Trial § 88). The trial judge "'may in a particular case be justified in examining some witnesses at considerable length, in an effort to bring out the true facts.'" *Anderson* 243 Kan. at 678 (quoting 75 Am. Jur. 2d, Trial § 88.) As long as the trial judge's questions are not slanted, no error results. See *Anderson* 243 Kan. at 678.

In this case, the trial judge had the authority to ask Novak questions. Thus, Marilyn cannot successfully argue that the trial judge was biased against her just because he asked Novak questions. Moreover, the trial judge merely asked Novak questions about who furnished the legal description of the land. The trial judge had no idea if the question was going to favor one party or the other. The trial judge was just trying to clarify a

53

discrepancy in the facts. Additionally, Novak's answer weighed in Marilyn's favor given that Novak testified that it was possible that she had looked up the legal description of the land in the Hannaford Title Company computer database as Marilyn had previously testified.

Second, the trial judge's action of adopting Lillian's proposed findings of fact and conclusions of law almost in its entirety does not show bias or require reversal. In the past, this court has held:

> "A district court's verbatim adoption of findings and conclusions proposed by one party is not a practice to be encouraged; but it is not, standing alone, a violation of either Supreme Court Rule 155 (2003 Kan. Ct. R. Annot. 202) or K.S.A. 2003 Supp. 60-252, or error. The test is whether the findings are supported by evidence in the record." *Ortiz v. Biscanin*, 34 Kan. App. 2d 445, Syl. ¶ 3, 122 P.3d 365 (2004).

As considered in the preceding section, the trial judge's legal conclusion that Marilyn unduly influenced Lillian and Elmer was proper because its findings of fact which buttressed that conclusion were supported by sufficient evidence. Consequently, this argument is without merit.

Third, Marilyn's argument that the trial judge let his emotions influence his decision is unpersuasive. Marilyn takes issue with the trial judge's findings (1) that "[she] likely gave [Novak] the legal descriptions" of the land and (2) that she walked away from the car when her parents signed the deed because "[she] knew that something wasn't right" and had a guilty intent. As discussed previously, the trial judge's finding that Marilyn likely gave Novak the legal descriptions of the land was probably unfounded given Novak's conflicting testimony. Further, it seems a bit of a stretch to interpret walking away from the car as a sign of bad faith without other evidence. Yet, Marilyn did not challenge whether sufficient evidence existed to support this particular finding in her brief. Regardless, outside of Marilyn's assertion, no evidence that the trial judge's

54

findings were the result of some bias against Marilyn exists. Overall, it seems the trial judge found Marilyn's testimony lacked credibility. As a result, the trial judge weighed most facts in Lillian's favor.

Finally, Marilyn's remaining allegations concerning trial judge bias stem from actions the trial judge took before her first appeal to this court. Appellate courts have no duty to consider issues that appellants could have, but failed to, raise in an earlier appeal. See *Kansas Baptist Convention v. Mesa Operating Ltd. Partnership*, 258 Kan. 226, 231, 898 P.2d 1131 (1995); *Estes v. Zinc Co.*, 97 Kan. 774, Syl. ¶ 2, 156 P. 758 (1916). Here, Marilyn could have and should have raised any issues concerning the trial judge's bias in her previous appeal. Because she failed to raise these issues in her previous appeal, we decline to consider her remaining allegations concerning the trial judge's alleged bias.

Affirmed.